**United States District Court**
For the Northern District of California

1
2
3          UNITED STATES DISTRICT COURT
4          NORTHERN DISTRICT OF CALIFORNIA
5              OAKLAND DIVISION
6
7   DEAN W. HALE,                          No. C 13-2151 PJH (PR)
8              Petitioner,                 **ORDER DENYING PETITION**
                                           **FOR WRIT OF HABEAS**
9        vs.                               **CORPUS AND GRANTING**
                                           **CERTIFICATE OF**
10  KIM HALLAND,                           **APPEALABILITY**
11             Respondent.
                                    /
12
13        This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §
14  2254.  The court ordered respondent to show cause why the writ should not be granted.
15  Respondent filed an answer and lodged exhibits with the court.  For the reasons set out
16  below, the petition is denied.
17                              **BACKGROUND**
18        Petitioner was sentenced to 325 years to life after a jury found him guilty of
19  numerous sexual offenses involving three young female victims.  Resp. Ex. E at 1-2.  The
20  California Court of Appeal affirmed the judgment in a partially published opinion.  Ex. E;
21  *People v. Hale*, 204 Cal. App. 4th 961 (Cal. Ct. App. 2012).  The California Supreme Court
22  denied the petition for review.  Exs. F, G.
23        Petitioner was charged with many counts related to lewd acts against Jane Doe
24  No.1, Jane Doe No. 2, and Jane Doe No. 3.  The California Court of Appeal set forth the
25  following background:
26        Lisa V. is the mother of Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No.
          3.  Jane Doe No. 2 and Jane Doe No. 3 have the same father.  Appellant is
27        the father of Jane Doe No. 1.
28        Appellant met Lisa and her two oldest daughters, Jane Doe No. 2 and Jane
          Doe No. 3, on Mother's Day in 1995 or 1996.  At the time, Jane Doe No. 3

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

was 10 years old and Jane Doe No. 2 was 8 years old.  Lisa and appellant became friends and, according to Lisa, had sex on one occasion, resulting in her becoming pregnant.  After Lisa became pregnant, she and appellant moved into a house together on C Street in Antioch.  Lisa worked the graveyard shift while appellant, who was a truck driver, stayed home with her daughters.

Jane Doe No. 1 was born on March 26, 1997.  When Jane Doe No. 1 was around eight months old, Lisa and her daughters moved out of the C Street house after the relationship between Lisa and appellant deteriorated.  Lisa and her daughters moved into unit 10 of the apartment complex in which they had previously resided.  Around that time period, Jane Doe No. 2 and Jane Doe No. 3 continued to visit with appellant on weekends.

Following her split from appellant, Lisa started dating a man named Calvin.  She became pregnant with his child and gave birth to Calvin Jr., approximately two and a half years after Jane Doe No. 1 was born.  Around the same time, Jane Doe No. 3, who was 14 years old, stopped visiting appellant.  When Jane Doe No. 2 was around 13 years old, during the time the family lived in unit 10, she complained of stomachaches and eventually ran away from home.  Jane Doe No. 2 was not in contact with her mother for about a year and a half.  She started visiting her mother periodically after that but never returned to live permanently with Lisa.

In 2002, Lisa moved to unit 155 in an apartment complex across the street from the unit 10 apartment along with Calvin, Calvin Jr., and Jane Doe No. 1.  By that time, Jane Doe No. 2 had run away and was living on the streets.  About a year and a half after moving into unit 155, Calvin moved out after he and Lisa broke up.  Lisa's mother and Jane Doe No. 3 moved into unit 155 after Calvin left.

While the family was living in unit 155, Jane Doe No. 1 visited regularly with appellant unless he was out of town on a long-haul trucking job.  Appellant moved into unit 155 for a few months after his mother died.

At some point in 2006, the family moved to a house on Buck Mountain Court in Antioch.  Jane Doe No. 1 continued to visit regularly with appellant while the family resided at the house on Buck Mountain Court.  In late 2007, appellant stayed at the Buck Mountain Court house for approximately six months because he was suffering from a medical problem.

At the end of 2007 and the beginning of 2008, Jane Doe No. 2 was staying with Lisa at the house on Buck Mountain Court.  Lisa overheard several arguments between Jane Doe No. 2 and appellant during which Jane Doe No. 2 would say things such as, "At least I don't touch my daughter."  Lisa asked Jane Doe No. 2 what she meant, but Jane Doe No. 2 would not say.

Around the same time, appellant began custody proceedings against Lisa in an attempt to gain custody of his daughter, Jane Doe No. 1.  On February 10, 2008, Jane Doe No. 2 finally told her mother that appellant had been molesting her and her sisters.  Lisa called the police on February 11, 2008.  Appellant was ultimately arrested on April 14, 2008.

Jane Doe No. 3 (Counts 35–58)
The first time appellant acted inappropriately towards Jane Doe No. 3

2

United States District Court

For the Northern District of California

occurred when she was 11 years old.  At the time, appellant was living with Lisa and her daughters in the house on C Street.  Appellant was taking a bath and called Jane Doe No. 3 and Jane Doe No. 2 into the bathroom.  Appellant *opened the shower curtain and asked, "[Do] you want to look at it?" Jane Doe No. 3 ran out of the bathroom after appellant showed them his penis.

About a week later, appellant began rubbing Jane Doe No. 3's back and then "slowly [went] to the front" and rubbed her breasts while she was in bed.  On other occasions, appellant got on top of Jane Doe No. 3, held her down on the bed, and fondled her breasts and vagina over her clothes.

Appellant moved back to his old house after he broke up with Lisa.  Following the break-up, Jane Doe No. 3 visited appellant five or six times a month for about a year.  It was during this time that appellant began fondling Jane Doe No. 3 both over and under her clothes.  She tried to push his hands away but he persisted.  During this time period, he touched her breasts under her clothes between 25 and 30 times, and he touched her vagina under her clothes between 15 and 20 times.

When Jane Doe No. 3 was 12 or 13 years old, appellant moved into an apartment in the same apartment complex in which she was living.  She was visiting appellant once or twice a week at the time.  It was around this time that appellant starting having sexual intercourse with Jane Doe No. 3.  On the first occasion, appellant called her into his bedroom, told her they would watch TV, made her lay down on the bed, started touching her, got on top of her, and took her clothes off.  Appellant put his penis in her vagina. Afterward, appellant said if she told anyone that he would take her away and hurt her mother and family.  Appellant had sexual intercourse with Jane Doe No. 3 approximately 15 to 20 times, up until she was 14 years old and stopped visiting him.  Jane Doe No. 3 physically resisted appellant on four or five occasions but otherwise "just let him do it and get it over with."  On one occasion, appellant pushed her down, took her pants off, and sodomized her.

Jane Doe No. 2 (Counts 31–34)

Jane Doe No. 2 recalled an incident in which appellant called her and Jane Doe No. 3 into the bathroom at the C Street house.  He was taking a bath and asked the girls if they wanted to touch his penis.  They both touched it, according to Jane Doe No. 2.

After Lisa and her daughters moved into an apartment, Jane Doe No. 2 and Jane Doe No. 3 continued visiting appellant at his house.  When Jane Doe No. 2 was nine, appellant asked if he could put his penis inside of her.  After putting Vaseline on his penis and her vagina, he started to put his penis in her vagina.  Jane Doe No. 2 told him it hurt, but appellant said it would hurt for just a minute and then it would not hurt anymore. Appellant stopped after Jane Doe No. 2 jerked away.  Appellant told her not to tell anyone or she would not see her family again.

During subsequent visits, appellant asked Jane Doe No. 2 to touch or suck his penis.  She refused.  On one occasion when Jane Doe No. 2 was nine, she got out of the shower and entered the bedroom.  She saw appellant and Jane Doe No. 3 in bed together with a blanket covering them.  Appellant was on top of Jane Doe No. 3.  It appeared to Jane Doe No. 2 that they were having sex.  Appellant told her to go back to the shower and that he would let her know when to come out.

United States District Court

For the Northern District of California

On one occasion when Jane Doe No. 2 was 19 years old, she visited her mother. She and Jane Doe No. 3 were sleeping in the living room.  At around midnight, she heard noises from her mother's bedroom.  She woke up Jane Doe No. 3, and they went to investigate the noises coming from the bedroom. Upon opening the door, they saw appellant in bed on top of Jane Doe No. 1. Jane Doe No. 3 took Jane Doe No. 1 to the front room.  Jane Doe No. 2 told appellant she was going to call the police.  Appellant tried to grab the phone and told them he was sorry, that he needed help, and that he would not do it again.  Appellant also told Jane Doe No. 2 that if she called the police, he would make sure they never saw their mother again.  Jane Doe No. 2 did not call the police.

When she was around 20 years old, Jane Doe No. 2 was staying with her mother at the house on Buck Mountain Court.  On February 10, 2008, she was talking with her mother about the custody case appellant had initiated. Her boyfriend, whom she referred to as the father of her children, was also present.  The boyfriend encouraged her to tell her mother what appellant had done to her and her sisters.  He said he would tell if she refused.  Jane Doe No. 2 then told her mother about the molestation.

Jane Doe No. 1 (Counts 1–29)

Jane Doe No. 1 visited appellant at his house when she was six or seven years old. He asked her to touch his penis. She complied. Subsequently, at appellant's request, Jane Doe No. 1 masturbated him until he ejaculated. He had her touch his penis more than 20 times during the year she visited him at his house. He also fondled her vagina more than 20 times during that period.

When appellant was living with Lisa's family at the unit 155 apartment, he had sexual intercourse with Jane Doe No. 1 more than 25 times.  He also had her masturbate him 20 to 25 times during that time period.  According to Jane Doe No. 1, when she was seven years old appellant was engaged in sexual intercourse with her when Jane Doe No. 2 and Jane Doe No. 3 entered the room and pulled her away from appellant.

The family moved into the house on Buck Mountain Court when Jane Doe No. 1 was around eight or nine years old.  During the period that appellant lived with the family in that house, he had sexual intercourse "maybe a little more than 25 times" with Jane Doe No. 1, fondled her 20 times, and had her masturbate him about 20 times.  On one occasion, he sodomized her at the Buck Mountain Court house.

Appellant moved out of the Buck Mountain Court house when Jane Doe No. 1 was nine or ten years old.  Jane Doe No. 1 continued to visit appellant after he moved out.  During these visits, appellant had sexual intercourse with Jane Doe No. 1 a total of "a little more than 25 times."  On about 10 occasions, appellant parked his truck by the waterfront and had sexual intercourse with Jane Doe No. 1 in the truck's sleeper cab.

When she was seven or eight years old, Jane Doe No. 1 started telling her family that she did not want to visit with appellant.  According to her mother, Jane Doe No. 1 often complained of stomachaches when the family lived in the unit 155 apartment.  Jane Doe No. 1 never told anyone about the molestation because appellant told her not to tell or else he would get in trouble.

1
2
3
4

Jane Doe No. 1 was first interviewed by the police on February 11, 2008, after her mother called the police about the molestation.  Jane Doe No. 1 had been visiting with appellant when the police came to interview her.  Appellant told her not to tell the police anything or he would go to jail.  Jane Doe No. 1, who was scared and confused, told the officer that appellant had not touched her.  A few weeks later, when she was interviewed at the children's interview center, she told the truth because she knew it was the "right thing" to do.

5
6
7
8
9
10
11

On March 3, 2008, a doctor examined Jane Doe No. 1.  She told the doctor her father had first started touching her inappropriately beginning when she was five or six and that it had last happened in February 2008.  The doctor reported that Jane Doe No. 1 had a white area of probable scar tissue between her vagina and anus.  The doctor was able to see one and a half inches into her vagina, as compared to at most a half-inch in a typical girl her age. The doctor concluded the exam results offered definitive evidence of prior vaginal penetration consistent with the history given by Jane Doe No. 1. The doctor explained that physical evidence is found in only 10 percent of alleged sexual assault cases and that Jane Doe No. 1's results fell into the fewer than two percent of all cases in which there are definitive findings of prior penetration.

12

Appellant's Statements to Police

13
14
15
16

A police officer conducted a videotaped interview of appellant on April 14, 2008.  Appellant waived his *Miranda* rights at the outset of the interview.  The videotape was played for the jury.  Initially, appellant denied the victims' allegations.  He claimed they were fabricating the allegations in response to his attempt to get custody of Jane Doe No. 1 and because he had caught Lisa and her older daughters stealing some of his belongings.  He also claimed family members were pushing Jane Doe No. 1 into making accusations against him.

17
18
19
20

During the course of the interview, appellant eventually admitted that the allegations against him were true.  He stated he never touched his nieces and that the only children he had touched inappropriately were Lisa's daughters.  He admitted that he had once asked Jane Doe No. 1 to touch him "down there," and "that's where it started."  He stated that the first inappropriate conduct with Jane Doe No. 2 and Jane Doe No. 3 was on an occasion when he was in the bathtub and they came into the room to talk to him.  According to appellant, they were curious about his penis so he let them look at it.

21
22
23

Appellant admitted he told Jane Doe No. 1 that he would go to prison if she told her mother or anyone else.  He also stated he only had sex with Jane Doe No. 2 on one occasion, claiming it "was never [Jane Doe No. 2] hardly.  It was just [Jane Doe No. 3]."

24

Defense Case

25
26
27
28

Timothy Bedgood was an Antioch police officer as of February 2008.  He testified at trial regarding his response to Lisa's initial report of molestation.  Although he did not have any independent recollection of the case, his report indicated he interviewed the victims on February 11, 2008.  The defense played his audiotaped interviews with the victims.  In the audiotaped interviews played for the jury, Jane Doe No. 1 denied any inappropriate touching by her father and Jane Doe No. 3 denied having anal or oral sex with him.  Bedgood admitted that after taking the initial report from Lisa, he called appellant, who was with Jane Doe No. 1, and asked them to meet him

at Jane Doe No. 3's workplace.  Jane Doe No. 3 had already returned to Lisa's home, so Bedgood placed Jane Doe No. 1 in his patrol car and asked appellant to follow him to Lisa's home.  Bedgood admitted that appellant was present outside Lisa's home during the initial interview with the victims.

Ex. E at 1-9 (footnotes omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

United States District Court

For the Northern District of California

1   determination will not be overturned on factual grounds unless objectively unreasonable in

2   light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at

3   340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

4                                              **DISCUSSION**

5          As grounds for federal habeas relief, petitioner asserts that: (1) the trial court erred

6   by failing to instruct the jury on the statute of limitations and trial counsel was ineffective for

7   failing to request an instruction; (2) there was insufficient evidence to support sodomy by

8   force; (3) the trial court erred by excluding impeachment evidence which prevented

9   petitioner from presenting a defense; and (4) several instances of prosecutorial misconduct.

10  **I.     Jury Instruction**

11         Petitioner contends that the trial court erred by failing to instruct the jury on the

12  statute of limitations and trial counsel was ineffective for failing to request the instruction.

13         **Legal Standard**

14         A state trial court's refusal to give an instruction does not alone raise a ground

15  cognizable in a federal habeas corpus proceeding. *See Dunckhurst v. Deeds*, 859 F.2d

16  110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived

17  of the fair trial guaranteed by the Fourteenth Amendment. *See id.* Due process does not

18  require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*,

19  456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).

20  The defendant is not entitled to have jury instructions raised in his or her precise terms

21  where the given instructions adequately embody the defense theory. *United States v. Del*

22  *Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996). A habeas petitioner whose claim involves a

23  failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v.*

24  *Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155

25  (1977)).

26         **Analysis**

27         To the extent that petitioner argues that his conviction violated the statute of

28  limitations, the court already dismissed that claim at screening for failure to state a federal

United States District Court

For the Northern District of California

1  claim.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas unavailable for

2  violations of state law or for alleged error in the interpretation or application of state law);

3  *Loeblein v. Dormire*, 229 F.3d 724, 726 (8th Cir. 2000) (rejecting claim that prosecution was

4  time-barred by applicable state statute of limitations because "a state court's failure

5  properly to apply a state statute of limitations does not violate due process or, indeed, any

6  other provision of the Constitution or a federal statute.")

7  　　　The California Court of Appeal denied petitioner's statute of limitations claim on the

8  merits.  Ex. E at 13.  After finding no violation of the statute of limitations the court denied

9  the jury instruction and ineffective assistance of counsel claim:

> Because we conclude that a prosecution for a violation of section 269 may be commenced at any time, the convictions in counts 32 and 57 are not subject to dismissal on statute of limitations grounds.  Further, there was no instructional error in connection with the purported failure to instruct the jury on the statute of limitations applicable to section 269.  In addition, appellant necessarily did not receive ineffective assistance of counsel as a result of his attorney's failure to request jury instructions on the statute of limitations applicable to section 269.

Ex. E at 13.  Petitioner has failed to show that the state court decision was unreasonable

and that the lack of the instruction deprived him of a fair trial guaranteed by the Fourteenth

Amendment.  Because there was no error with respect to the jury instruction, trial counsel

was not ineffective for failing to request the instruction.  This claim is denied.

## II.    Sufficiency of the Evidence

　　　Petitioner next argues that there was insufficient evidence to support the conviction

of forcible sodomy of Jane Doe No. 1.

### Legal Standard

　　　The Due Process Clause "protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

evidence in support of his state conviction cannot be fairly characterized as sufficient to

have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a

constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven,

United States District Court

For the Northern District of California

entitles him to federal habeas relief, *see id.* at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (finding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

**Background**

Jane Doe No. 1 testified that she has been subjected to multiple molestations between the ages of six and ten. In describing one specific incident, she testified that when she was nine appellant came into her room and told her he was going to do something "different." Appellant put Vaseline on his penis, placed her on her stomach, got on top of her, and put his penis in her anus. According to Jane Doe No.1, it hurt "a lot". Even after she told appellant that it hurt, he continued to penetrate her anus with his penis for "a couple of minutes," and then told her not to tell anyone. Jane Doe No. 1 explained that she did not tell anyone about the sodomy incident because appellant had previously told her that if she told about the molestation he would get in trouble.

Ex. E at 14.

The jury was instructed on the elements of forcible sodomy.[1] The trial court instructed that to find petitioner guilty they had to find that the victim "did not consent to the

---

[1] Petitioner was found guilty under former California Penal Code section 286(c)(2) which states, "[a]ny person who commits an act of sodomy when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished in the state prison for three, six, or eight years." Ex. E at 15.

United States District Court

For the Northern District of California

act" and that he "accomplished the act by force or violence, or duress, or menace, or fear of immediate and unlawful bodily injury to someone."  Reporter's Transcript ("RT") at 1080. Force was defined as when, "a person used enough physical force to overcome the other person's will."  RT at 1081.  The trial court defined duress as, "[it] means a direct or implied threat of force, violence, danger, hardship, or retribution that causes a reasonable person to do or submit to something that he or she would not otherwise do or submit to.  When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the female minor and the female minor's relationship to the defendant." *Id*.

**Analysis**

The California Court of Appeal set forth the relevant state law regarding force and various types of sexual assaults under California law and found sufficient evidence to support the conviction:

> Appellant contends the evidence is insufficient to support his conviction for forcible sodomy because "there was nothing described beyond the actual sodomy that would suggest appellant was applying any sort of hold, or other pressure to force her into compliance."  His argument rests on the premise that a conviction of forcible sodomy must be supported by evidence that the physical force used by the perpetrator was greater than or different from the force used to accomplish the sexual act itself. . . .

> . . .

> Here, the jury could have reasonably concluded that appellant's act of positioning himself on top of Jane Doe No. 1 and refusing to stop when she told him he was hurting her combined to constitute the requisite amount of force to overcome her will, bearing in mind that Jane Doe No. 1 was a nine-year old girl at the time and appellant was described as a very large man weighing 290 pounds.  We therefore reject appellant's challenge to the sufficiency of the evidence on the ground there was insufficient evidence of force.

> Furthermore, even if the evidence of force were insufficient to support a conviction for forcible sodomy, there was nonetheless sufficient evidence to show that appellant used duress to overcome the victim's will.  As noted above, the court instructed the jury with the definition of duress and the prosecutor specifically relied on a duress theory as an independent basis supporting the forcible sodomy conviction. . . .

> In this case, Jane Doe No. 1's father subjected her to continuous acts of sexual molestation when she was between the ages of six and ten.  He told her that she should not tell anyone about the molestation because he could

1    go to prison.  On this particular occasion, he put her on her stomach, got on
2    top of her, and penetrated her anus with his penis.  He continued to sodomize
     her even though she complained that it hurt.  Under the circumstances,
3    appellant "took advantage not only of his psychological dominance as an
     adult authority figure, but also of his physical dominance to overcome her
     resistance to molestation.  This qualifies as duress. [Citations.]"  (*People v.*
4    *Schulz*, *supra*, 2 Cal. App. 4th at p. 1005, 3 Cal. Rptr. 2d 799.)

5    In sum, there was substantial evidence to demonstrate that appellant
     committed forcible sodomy against Jane Doe No. 1 by both force and duress,
6    either of which would be sufficient to uphold the conviction.

7  Ex. E at 16-20.

8        To the extent petitioner argues that the California Court of Appeal incorrectly applied

9  state law in determining what constitutes force to prove forcible sodomy, any such claim is

10  denied because it is a matter of state law that does not present a federal habeas claim.

11  *See Estelle,* 502 U.S. at 67-68.  Nor has petitioner shown that the state court's finding of

12  sufficient evidence was an unreasonable application of Supreme Court authority.  Viewing

13  the evidence presented at trial in the light most favorable to the prosecution, any rational

14  trier of fact could have found the essential elements of forcible sodomy beyond a

15  reasonable doubt.  The jury could have relied on the physical force used by petitioner or on

16  duress, which was provided for in the controlling version of California Penal Code section

17  286(c)(2).  There was sufficient evidence presented at trial, and petitioner has failed to

18  meet the high burden to obtain relief on this claim.

19  **III.**    **Exclusion of Impeachment Evidence**

20        Petitioner next argues that he was denied the right to impeach the credibility of the

21  mother, Lisa V., with evidence of a prior shoplifting incident, which violated his right to

22  present a defense.

23        **Legal Standard**

24        "The Constitution guarantees criminal defendants 'a meaningful opportunity to

25  present a complete defense.'"  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)

26  (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  The constitutional right to present

27  a complete defense includes the right to present evidence, including the testimony of

28  witnesses.  *Jackson v. Nevada*, 688 F.3d 1091, 1096 (9th Cir. 2012) (overruled on other

grounds).  But the right is only implicated "when the evidence the defendant seeks to admit is 'relevant and material, and  . . . vital to the defense.'"  *Id.* (omission in original) (citation omitted).  Additionally, a violation of the right to present a defense does not occur any time such evidence is excluded, "but rather only when its exclusion is 'arbitrary or disproportionate to the purposes [the exclusionary rule is] designed to serve.'"  *Id.* (alteration in original) (citation omitted).  This is true even if the rule under which it is excluded is respected, frequently applied and otherwise constitutional.  *Id.*  "If the 'mechanical' application of such a rule would 'defeat the ends of justice,' then the rule must yield to those ends."  *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).  Thus, where a state criminal defendant asserts that the exclusion of evidence at trial violated his right to present a defense, a federal habeas court "must consider the value of the evidence in relation to the purposes purportedly served by its exclusion to determine whether a constitutional violation has occurred."  *Id.* at 1097.

A violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict.  *Jackson*, 688 F.3d at 1104 (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).

**Background**

The trial court permitted the defense to cross-examine Jane Doe No. 2 about a shoplifting conviction she had suffered.  RT at 374.[2]  However, the defense was prohibited from referring to arrests of Jane Doe No. 2 that did not result in a conviction.  The trial court also held that Lisa V. could not be impeached with evidence of her arrest for petty theft because the arrest led to a diversion program by Contra Costa County instead of a prosecution.  RT at 72-73.  The trial court noted that it did not appear that the arrest resulted in a conviction or an admission of wrongdoing.  *Id.*

Petitioner's trial counsel filed a motion for reconsideration and provided background information from a police report that Lisa V. and Jane Doe No. 2 attempted to shoplift

---

[2] The prosecution brought up these facts on direct examination.  RT at 612.

United States District Court

For the Northern District of California

1    $405.30 worth of items from a Winco store.  Clerk's Transcript ("CT") at 315.  Petitioner

2    argued that this demonstrated that Lisa V. and Jane Doe No. 2 had engaged in a criminal

3    conspiracy in the past.  *Id.*

4         The trial court denied the motion for reconsideration, stating:

5         I think allowing some implication that the jury might draw off of the fact that
          the mother and the daughters participated in some sort of theft together as
6         also suggesting that they are now falsifying information about [petitioner]
          together in a similar sort of conspiracy, to me, under [Evidence Code §] 352,
7         would be a significant distortion of the facts of this case, especially to the
          extent that it would suggest that that conspiracy somehow resulted in Jane
8         Doe No. 1 and Jane Doe No. 3 also falsifying similar information where there
          is no evidence of that fact.

9
          As I said before, the convictions with respect to Jane Doe No. 2, (Jane Doe
10        2), will be permitted because they are convictions for crimes of moral
          turpitude.  I indicated to you the extent to which I would permit that
11        impeachment.

12        . . .

13        I think trying to suggest that there is some kind of criminal conspiracy,
          organized gang of thieves, goes way beyond what this evidence suggests
14        and I think it would confuse the issues with this jury under [Evidence Code §]
          352 to allow that implication to this case at this time.
15
     RT at 374, 376.[3]
16
          **Analysis**
17
          The California Court of Appeal discussed the applicable state law and then denied
18
     this claim:
19
          The record available to this court is inadequate to demonstrate that Lisa was
20        ever convicted of petty theft or that she even admitted the charge before
          being referred to diversion.  Thus, as a threshold matter, we are inclined to
21        agree with the Attorney General that there is little more than an arrest for
          misdemeanor theft to substantiate appellant's claim that Lisa had a dishonest
22        character.

23        Further, while the court had discretion to admit evidence of the underlying
          conduct even without a conviction (*see People v. Ayala* (2000) 23 Cal. 4th
24        225, 273), the court properly found that the minimal probative value of the
          evidence was outweighed by the danger of undue prejudice, undue
25        consumption of time, and misleading the jury.  Allowing the evidence would

26    ─────────────────────

27        [3] California Evidence Code section 352 states, "[t]he court in its discretion may exclude
     evidence if its probative value is substantially outweighed by the probability that its admission
28    will (a) necessitate undue consumption of time or (b) create substantial danger of undue
     prejudice, of confusing the issues, or of misleading the jury."

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

have likely necessitated a trial within a trial regarding the shoplifting incident. Although the conduct, if established, would have demonstrated moral turpitude, it would have been minimally probative.  As the court explained, the fact that Lisa had been involved in shoplifting with Jane Doe No. 2 did not have any logical connection to appellant's theory that Lisa conspired with not only Jane Doe No. 2-but also Jane Does No. 1 and No. 3-to fabricate sexual abuse allegations against appellant.  Under the circumstances, the court did not abuse its discretion by excluding the evidence.

Even if the court did err in excluding the evidence, any error was harmless. The parties dispute whether the harmless error analysis is governed by *People v. Watson* (1956) 46 Cal. 2d 818, or by *Chapman v. California* (1967) 386 U.S. 18.  We need not resolve the dispute, because any claimed error was harmless under either standard.  The evidence of Lisa's shoplifting had little bearing on the theory that she had conspired with her daughters to fabricate the allegations.  Lisa's participation in a shoplifting incident with Jane Doe No. 2 did not tend to show that Jane Doe No. 1 and Jane Doe No. 3 were inclined to conspire with their mother to fabricate allegations against appellant.  Moreover, the person who had allegedly conspired with Lisa to commit a petty theft-Jane Doe No. 2-only testified to one incident of rape by appellant, thus diminishing the likelihood she was conspiring to falsely accuse him.  Jane Doe No. 1 and Jane Doe No. 3 each testified that appellant had sexually abused them for a period of years.  The physical evidence corroborated Jane Doe No. 1's allegations.  Most importantly, appellant admitted that he raped both Jane Doe No. 1 and Jane Doe No. 3.  In addition, his description of how the victimization began with each of the victims was consistent with the victims' testimony.

In sum, the evidence against appellant, including the victims' testimony, the physical corroboration, and appellant's admissions, was overwhelming.  Any error in failing to allow the jury to hear remotely probative evidence of Lisa's involvement with Jane Doe No. 2 in a shoplifting incident was harmless beyond a reasonable doubt.

Ex. E at 23-24.

Petitioner has not shown that the state court's ruling was an unreasonable application of Supreme Court authority.  The evidence that was excluded was of minimal importance and only pertained to one of the three victims, Jane Doe No. 2. The majority of the counts against petitioner involved the other two victims, and the trial court did allow petitioner to cross-examine Jane Doe No. 2 with evidence of a prior conviction for shoplifting.  Petitioner has not demonstrated that his inability to discuss Jane Doe No. 2's participation in shoplifting with Lisa V. precluded him from having a meaningful opportunity to present a complete defense.  Petitioner does not address the fact that he admitted much of the conduct which corroborated the testimony of the victims.  Even if it was an error to preclude the impeachment of the witness, it did not have a substantial and injurious effect

14

1    on the verdict to warrant habeas relief.

2    **IV.    Prosecutorial Misconduct**

3         Petitioner asserts that the prosecutor committed misconduct during closing

4    argument by (1) appealing to the jury's passions and prejudices; (2) denigrating defense

5    counsel; (3) attacking petitioner's character; (4) vouching for a prosecution witness; and (5)

6    misstating the evidence.

7         **Legal Standard**

8         Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate

9    standard of review is the narrow one of due process and not the broad exercise of

10   supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due

11   process rights are violated when a prosecutor's misconduct renders a trial "fundamentally

12   unfair." *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process

13   analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

14   culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's

15   remarks were improper; if so, the next question is whether such conduct infected the trial

16   with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial

17   misconduct claim is decided "'on the merits, examining the entire proceedings to determine

18   whether the prosecutor's remarks so infected the trial with unfairness as to make the

19   resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th

20   Cir.) (citation omitted), *cert. denied*, 516 U.S. 1017 (1995); *see Trillo v. Biter*, 754 F.3d

21   1085, 1091 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the

22   prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

23        **1.    Appealing to the Jury's Passions and Prejudices**

24        **Background**

25        At the outset of his closing argument the prosecutor thanked the jurors for their

26   service and the following exchange occurred:

27        [Prosecutor]: Because even in cases like this where there's no absolutely no
          doubt as to the defendant's guilt - -
28

15

1   [Trial Counsel]: Objection.

2   [Trial Court]: Overruled.

3   [Prosecutor]:  - - a defendant in our society is still entitled to a jury trial.  He is
    entitled to have members of the community, you folks, to decide his guilt.  Not
4   a judge, not me.  You folks.

5   RT at 1117.  The prosecutor then showed the jury pictures of the victims as young girls

6   when the crimes occurred and stated:

7   And you met all three of them one by one here on the stand.

8   But I'd like to introduce you to the real [Jane Doe No. 3], the real [Jane Doe
    No. 2], and the real [Jane Doe No. 1].  The three little girls that he violated.
9   I'm going to show you what's been marked as Plaintiff's Exhibit 2 and 3.  I
    know you folks haven't seen these yet.  Two has [Jane Doe No. 3] on your
10  view in the upper left-hand corner and [Jane Doe No. 2] in the upper
    right-hand corner.  This is [Jane Doe No. 1].

11  . . .

12  These are the real victims. These are the little girls that he violated over and
13  over again.  What he did to these girls is unjustified.

14  RT at 1119.

15  Several minutes later, the prosecutor discussed how physical evidence is often

16  lacking in these types of cases and how there are delays in victims reporting abuse.  RT at

17  1121-22.  He then stated, "[i]t's important that you understand this reality and the limitations

18  on evidence, because I guarantee you he does.  He's hiding behind those limitations of

19  evidence to avoid the very thing I'm asking you to do here today . . .  which is convict him of

20  all of the charged offenses."  RT at 1123.

21  **Analysis**

22  The California Court of Appeal considered and denied this claim.

23  Appellant contends the cited portions of the prosecutor's comments were
    improper because they appealed to the emotions and sympathies of the jury
24  by repeatedly suggesting the trial was a mere formality and that appellant was
    hiding behind rules of evidence in a manner that allowed him to victimize the
25  girls once again.  We disagree.

26  The prosecutor was simply explaining that our legal system affords all
    defendants the right to a jury trial, even if the evidence overwhelmingly proves
27  the defendant's guilt.  Similarly, the prosecutor was explaining the unique
    evidentiary limitations in these types of cases-that the victims' testimony is
28  often uncorroborated and generalized, that physical evidence is often lacking,

16

1   and the victims delay reporting-and suggesting that those limitations should
    not prevent the jury from finding the allegations proved beyond a reasonable
2   doubt.  Contrary to appellant's characterization of the prosecutor's argument,
    the prosecutor was not suggesting the "technical rules of evidence were
3   baloney"; he was merely explaining to the jury that it should not draw adverse
    inferences from the fact that the victims had given generalized testimony or
4   had initially refused to disclose the abuse.

5   Appellant cites the general proposition that the prosecutor is not permitted to
    "skew the procedural protections and presumptions that are intended to
6   protect an accused," but he has pointed to nothing specific in the prosecutor's
    comments that a jury might construe as an attempt to denigrate those
7   protections.  The prosecutor merely explained that those procedural
    protections extend to all defendants, but that those protections, along with
8   evidentiary limitations specific to child molestation cases, did not prevent the
    jury from finding guilt in an appropriate case.

9   Appellant also relies on the general proposition that it is improper to "make
10  arguments that are designed to inflame a jury's sympathies, prejudices and
    emotions," but he again fails to point to any particular statement that would
11  improperly inflame a jury's sympathies and prejudices.  For example, when
    the prosecutor referred to Jane Does Nos. 1, 2, and 3 as "the real victims," he
12  was commenting on already admitted evidence-photographs of the victims as
    they looked at the time of the offenses.  A comparison of appellant's size to
13  that of the victims as of the time of the offenses was clearly relevant to the
    jury's assessment of evidence bearing on the use of force or duress, and it
14  was reasonable for the prosecutor to remind the jury that Jane Doe No. 2 and
    Jane Doe No. 3-who were adults at the time of trial-were young girls at the
15  time the offenses were committed.  The fact that seeing photographs of
    young, innocent, and victimized girls might generate sympathy or prejudice
16  was a direct result of the nature of appellant's crimes and was not the result
    of an attempt by the prosecutor to improperly inflame the jury's passions.

17  There was also nothing improper in the prosecutor's effort to remind the jury
18  that (1) the testimony of a child molestation victim is often the only evidence
    available to prove the allegations and (2) victims are required to face their
19  abuser and discuss very private, embarrassing events in front of a group of
    strangers.  Further, to the extent the prosecutor used colorful language to
20  describe the victims' courtroom testimony as a further victimization, the
    statements were within the bounds of acceptable argument.  It is well settled
21  that "[p]rosecutors are permitted to make vigorous, colorful arguments with
    obvious hyperbole . . . ." (*People v. Lewis* (2004) 117 Cal. App. 4th 246, 259.)
22  We therefore reject appellant's contention that the prosecutor improperly
    appealed to the sympathies and prejudices of the jury.

23  Ex. E at 27-28.

24      The state court's denial of this claim was not an unreasonable application of

25  Supreme Court authority.  The California Court of Appeal noted that the prosecutor's

26  comments were not inappropriate.  It was permissible to remind the jury that the victims

27  had been much younger when the abuse occurred, that petitioner was entitled to a trial,

28  and that a lack of physical evidence was common.  None of these comments rendered the

United States District Court

For the Northern District of California

trial fundamentally unfair, especially in light of the overwhelming evidence presented against petitioner including his own inculpatory statements. The denial of his claim was not unreasonable, and the claim is denied.

### 2.  Denigration of Defense Counsel

**Background**

At the conclusion of his closing argument, petitioner's trial counsel stated:

> What if I were to tell you right now that I had a little DVD, like a video, that would show you at all times, at all times when these instances are alleged to have occurred. I have a video. You could actually see for yourself right now what happened or didn't happen. All right. How many people would want to see that video?

> Right.

> If you want to see that video, that's because you don't know what happened. You don't know what happened. You've heard testimony. Some evidence. Both sides. You don't know. We [weren't] there. [The prosecutor] as much as he wants to persuade you as, as much as he wants to tear down even Officer Bedgood, he's just doing his job, and make it seem like he's the only cop there and he's a [loser] cop or something. He was there with the social worker and another police officer. [The prosecutor] wasn't there. I wasn't there. The Judge wasn't there. If you need that video for you to know whether or not it happened or not, you've got a reasonable doubt. There is reasonable doubt in this case.

RT at 1206.

Immediately after this statement, the prosecutor delivered his rebuttal argument and the following exchange occurred:

> [Prosecutor]: I thought so. There is no video. Don't be fooled. There is no video. That's a typical trick--

> [Defense Counsel]: Objection.

> [Trial Court]: Sustained.

> [Prosecutor]: All right. Well, we talked about the limitation on the evidence. That is ridiculous.

> [Defense Counsel]: Objection.

> [Trial Court]: Overruled.

> [Prosecutor]: First off, in our society, I'm one of those people [that] if there is a train wreck on TV, I want to see the video. Not because I don't believe the train wreck happened or not I don't believe the reporter telling me the train crashed. I want to see the video because I'm curious. There is a big difference about when to see something when you are curious and the

1    concept of reasonable doubt.

2    RT at 1207.

3    **Analysis**

4    The California Court of Appeal considered and denied this claim.

5    Appellant contends the prosecutor's statements improperly impugned
6    defense counsel. No[t] so. Although it might have been misconduct to attack
     defense counsel personally or to attack his integrity (*People v. Hill* (1998) 17
7    Cal. 4th 800, 832), the transcript reveals no such attack. The prosecutor
     denounced defense counsel's argument about needing to see a videotape of
8    the crime to prove appellant's crime beyond a reasonable doubt; he did not
     denounce defense counsel. Further, the prosecutor's response was simply
9    consistent with his previous-and-proper-argument that the jury should not find
     reasonable doubt simply because of the inherent limitations on evidence used
10   to prove child molestation allegations. A prosecutor is permitted to use
     colorful language to criticize counsel's tactical approach. (*See People v.*
11   *Stitely* (2005) 35 Cal. 4th 514, 559-560 [prosecutor did not commit
     misconduct in telling jury "to view counsel's argument as a 'ridiculous' attempt
12   to allow defendant to 'walk' free"].) Thus, appellant has not demonstrated that
     the prosecutor's response to defense counsel's argument constituted
13   misconduct.

14   Ex. E at 29.

15   The prosecutor's statement was not misconduct, and the state court denial of this

16   claim was not unreasonable. The prosecutor was referring to trial counsel's reference to a

17   videotape of the incidents when no such video existed; it was only a way for trial counsel to

18   describe reasonable doubt. The prosecutor was commenting on the argument not defense

19   counsel himself. Moreover, "[t]he prosecutors' comments must be evaluated in light of the

20   defense argument that preceded it." *Darden*, 477 U.S. at 179. An argument that is an

21   "invited response" to defense counsel's remarks does not prejudice the jury. *United States*

22   *v. Young*, 470 U.S. 1, 11-13 (1985). Petitioner is not entitled to habeas relief on this claim.

23   **3.    Attacking Petitioner's Character**

24   At the beginning of his closing argument the prosecutor described petitioner as "a

25   two-faced monster." RT at 1119. Later, while referencing petitioner's confession, the

26   prosecutor stated, "[n]ow granted, it's coming from the mouth of a monster, a pedophile, a

27   child molester . . . . " RT at 1172.

28   Petitioner argued that the prosecutor used derogatory characterizations of him and

United States District Court
For the Northern District of California

1   this encouraged the jury to disregard the evidence and convict him due to his purported

2   criminal proclivities.  The California Court of Appeal denied this claim:

> The claim fails because the prosecutor's characterization of appellant was based on evidence at trial-not any other "propensity" evidence.  Our Supreme Court has consistently "upheld the use of 'appropriate epithets warranted by the evidence.' [Citation.]"  (*People v. Sully* (1991) 53 Cal. 3d 1195, 1236.)  Thus, for example, in *People v. Adcox* (1988) 47 Cal. 3d 207, 237, a reference to the defendant as a "coldblooded murderer" was held to be proper in light of the facts.  Similarly, in *People v. Edelbacher* (1989) 47 Cal. 3d 983, 1030, the court concluded the prosecutor did not commit misconduct in referring to a defendant as, among other things, a "snake in the jungle," a "pathological liar," and "slick," when the prosecutor based the comments on the evidence.
>
> The evidence at trial here demonstrated that appellant was a child molester and a pedophile, in that he raped his daughter and her half-sister over a period of 10 years.  Indeed, Jane Doe No. 1's molestation was so pervasive and severe that she fell within the two percent of cases in which definitive physical injury can not only be detected but can be proved to result from sexual penetration.  Based on the evidence, it was within the bounds of fair argument to describe appellant as a child molester, a pedophile, and a monster.  (*See People v. Harrison* (2005) 35 Cal.4th 208, 245-246 [not misconduct to call defendant " 'a head hunter,'" a "'one-man gang,'" and the "'lowest common denominator and the complete and total essence of evil' "].)

Ex. E at 30.

Petitioner is not entitled to habeas relief for this claim.  In *Darden*, the Supreme Court held that the prosecutor's remarks during closing argument, which included calling the defendant an "animal," labeling the crime as "the work of an animal," and arguing that the defendant should not be let out of his cell without "a leash," did not render the defendant's trial fundamentally unfair.  *Id.* at 181-83.  In this case, the prosecutor's few references reflected the evidence presented at trial and did not render the trial fundamentally unfair.  The California Court of Appeal's denial of this claim was not unreasonable.

**4.    Vouching for Jane Doe No. 2**

During closing argument the prosecutor described Jane Doe No. 2 as the "black sheep of the family" and described how she ran away at age twelve, lived on the streets, and got into trouble with the law.  RT at 1127.  He stated that she ran because of petitioner's sexual abuse of her and her sisters.  *Id.*  After comparing her to various movie

characters (RT at 1128), the prosecutor stated the following, which elicited an objection

from trial counsel for vouching:

> Let's face it.  [Jane Doe No. 2] is the one that did the most heroic act in this
> case.  She's the one that finally had the courage to take him on and start
> making comments.  She's the one who finally told.  She's the one.  That was
> her act of heroism.  That took a lot of courage and a lot of guts, especially
> when you're that black sheep and outcast of the family.

RT at 1128-29.

The California Court of Appeal set forth relevant state law regarding prosecutorial

vouching and denied the claim:

> When viewed in context, the challenged statements do not suggest the
> prosecutor's assessment of Jane Doe No. 2 was based on anything other
> than the evidence offered at trial.  The evidence demonstrated that, after
> years of secrecy, Jane Doe No. 2 finally came forward to disclose appellant's
> molestation, an effort that required her to discuss matters that were painful,
> embarrassing, and private.  It was reasonable for the prosecutor to suggest
> that her actions were heroic in light of the evidence that she had been
> molested, had run away from home, lived on the streets, suffered criminal
> convictions, and given birth to a child before she was 18 years old.  Moreover,
> to compare her heroism to actions in a movie was not improper.  Counsel
> may state matters not in evidence that are common knowledge or that draw
> on common experience, history, or literature.  (*People v. Hill*, supra, 17
> Cal.4th at p. 819.)  The prosecutor's statements were a fair interpretation of
> the evidence and did not constitute misconduct.

Ex. E at 30-32.

A prosecutor may not vouch for the credibility of a witness.  *United States v.
Jackson*, 84 F.3d 1154, 1158 (9th Cir. 1996).  Improper vouching for the credibility of a
witness occurs when the prosecutor places the prestige of the government behind the
witness or suggests that information not presented to the jury supports the witness's
testimony.  *Young*, 470 U.S. at 7 n.3, 11-12.  To warrant habeas relief, prosecutorial
vouching must so infect the trial with unfairness as to make the resulting conviction a denial
of due process.  *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004) (citation omitted).[4]

---

[4] Other factors for determining when reversal is required for improper vouching include:
"the form of vouching; how much the vouching implies that the prosecutor has extra-record
knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court
is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the
vouching; the extent to which the witness's credibility was attacked; the specificity and timing

United States District Court
For the Northern District of California

1    The state court did not unreasonably apply Supreme Court authority in denying this

2    claim.  The prosecutor did not engage in any improper vouching of the witness; rather, he

3    described the evidence that was presented at trial.  The prosecutor did not imply any extra-

4    record knowledge concerning the witness or contend that the court was monitoring her

5    truthfulness.  The prosecutor described the witness's background, which had been

6    presented at trial.  Even assuming this was improper, petitioner has failed to demonstrate

7    that the error was so egregious that it denied him due process.  The claim is denied.

8        **5.      Misstatements of Fact**

9        Petitioner cites three statements by the prosecutor that he contends misstated the

10   evidence: (i) that Jane Doe No. 2 ran away from home because of petitioner; (ii) that the

11   police officer who initially interviewed the victims did not want to write a report and shirked

12   his responsibilities; and (iii) that the doctor who examined Jane Doe No. 1 testified that

13   there was physical evidence of recent penetration.

14        **(i)**

15       As discussed in the prior claim, the prosecutor stated in closing argument that Jane

16   Doe No. 2 ran away from home because of petitioner's sexual abuse.  Petitioner argues

17   that Jane Doe No. 2 never testified to this and there were other reasons why she ran away,

18   such as her mother's drug use and because her mother was in an abusive relationship with

19   another man.  The state court denied this claim:

20        We conclude the challenged statements fairly characterized the evidence.
          Jane Doe No. 2 testified she ran away from home because she did not feel
21        "safe" in the home because of "things that was going on."  She later expanded
          on why she left instead of telling her mother about the abuse, responding that
22        she chose to leave because appellant told her she "wouldn't see [her] family
          again if [she] told anybody or anything like that."  It was certainly reasonable
23        to infer that she did not feel safe because of appellant's actions and because
          of her mother's failure to protect her and her sisters.  Further, although she
24        did not explicitly state that she ran away from home as a result of appellant's
          actions, she did not suggest she ran away from home for the reasons
25        proposed by appellant.  Each party was free to draw reasonable inferences
          from the fact that Jane Doe No. 2 did not feel safe, and while it was
26        reasonable for defense counsel to focus on Lisa's failings as a mother, it was

27   ─────────────────

28   of a curative instruction; the importance of the witness's testimony and the vouching to the
     case overall." *United States v. Parker*, 241 F.3d 1114, 1120 (9th Cir. 2001) (citation omitted).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   not unreasonable for the prosecutor to focus on appellant's criminal behavior.

2   Ex. E at 32-33.

3        The California Court of Appeal's decision was not unreasonable.  A review of Jane

4   Doe No. 2's testimony indicates that she left home due to petitioner's sexual abuse.  RT at

5   606-09.  While there could have been other reasons why she ran away, the prosecutor's

6   statement was a reasonable inference of her testimony.  The statement was not

7   misconduct, and the claim is denied.

8              **(ii)**

9        Petitioner next argues that the prosecutor misstated the facts related to the

10  testimony of a police officer who testified for the defense regarding his first interviews with

11  the victims who denied sexual abuse.  The California Court of Appeal set forth the

12  background and denied this claim:

13       Appellant also objects to statements by the prosecutor asking the jury to
         disregard the report of Antioch police officer who first investigated the
14       allegations, officer Tim Bedgood, because he "did not want to fully investigate
         the case" and "was too lazy to write a report about the charges."  The
15       prosecutor referred to "ex-police officer Mr. Tim Bedgood" as someone who
         had zero recollection of this case."  The prosecutor stated that the lack of
16       recollection of something that had occurred the year before was because the
         officer "blew it off" and "didn't want to write a report."  The prosecutor
17       continued: "You heard him.  A minute and a half with a ten-year old victim.
         Time it.  You've got the tape.  A minute and a half.  Under seven minutes with
18       [Jane Doe No. 3].  Before interviewing them, [he] has the defendant drive
         over to meet him at [Jane Doe No. 3's] work.  Bring the molester to the
19       victim's place of work.  Really? [¶] And then when she's not there, bring the
         molester to the victim's house.  Have him stand outside with the ten-year-old
20       victim while you go inside and interview the other two victims."

21       . . .

22       The inferences drawn by the prosecutor about officer Bedgood's motivation
         are fairly supported by the evidence at trial.  The evidence demonstrated that
23       the officer conducted brief interviews with the victims, that he was aware of
         the pending custody case at the time of the interviews, and that he had no
24       independent recollection of any of the allegations.  Further, he brought the
         alleged molester to the interview location and was satisfied with the answers
25       to his brief set of questions.  It was certainly reasonable for the prosecutor to
         suggest that officer Bedgood had made up his mind at the outset and
26       consequently failed to do a thorough investigation.  As the trial court
         explained to the jury, defense counsel was free to draw different inferences
27       from officer Bedgood's testimony and the content of the audiotaped
         interviews.  The fact that different inferences could be drawn, however, did
28       not demonstrate that the prosecutor committed misconduct.

United States District Court
For the Northern District of California

1   Ex. E at 33-34.

2   The California Court of Appeal's decision was not unreasonable. A review of Officer

3   Bedgood's testimony (RT at 958-1005) and the transcript of his interview with the victims

4   (Ex. A, Vol. IV at 782-87) demonstrate that the prosecutor's statement reflected the

5   evidence and his conclusion that Bedgood had made up his mind at the beginning of his

6   investigation was a reasonable inference. Petitioner has not shown that the state court was

7   unreasonable and that the prosecutor's statement rendered the trial fundamentally unfair;

8   therefore, the claim is denied.

9   **(iii)**

10   Finally, petitioner contends that the prosecutor misstated the facts related to the

11   testimony of the doctor who examined Jane Doe No. 1 and whether there was physical

12   evidence of recent penetration. During the prosecutor's rebuttal argument the following

13   exchange occurred:

14   [Prosecutor]: One correction that I have to make before I get close to
     wrapping up, [defense counsel's] statement that Dr. Carpenter said there was
15   no evidence of recent penetration is false.

16   [Defense Counsel]: Objection.

17   [Trial Court]: Overruled.

18   [Prosecutor]: You have the transcript. That is not what he said.
     That is not what he said.
19
     [Defense Counsel]: Same objection.
20
     [Trial Court]: Overruled.
21
22   [Prosecutor]: What he talked about is that he couldn't tell you how many times
     or when, but there had to be at least one recent incident, in fact, he said that
     what he saw on his examination was completely consistent with (Jane Doe
23   1's) recitation of when the last time she had sexual intercourse with her father
     was.
24
     RT at 1208-09.
25
     The California Court of Appeal denied this claim:
26
     A review of the evidence reveals that the prosecutor's characterization of the
27   evidence is at least arguably correct. The doctor testified that Jane Doe No. 1
     told him in March 2008 that the last time appellant had sexual intercourse with
28   her was in the preceding month. The doctor opined that the results of the

24

United States District Court

For the Northern District of California

1   physical examination were consistent with the history given by Jane Doe No.
2   1.  It was not unreasonable for the prosecutor to infer that the doctor's
    conclusion extended to Jane Doe No. 1's claim of being penetrated within the
3   previous month.  On cross-examination, the doctor clarified that he could not
    definitively say when Jane Doe No. 1 had suffered trauma to her vagina,
4   although he did not rule out the possibility that it had occurred within weeks of
    the exam.

5   In response to a claim by defense counsel that there was no evidence of
    recent penetration, the prosecutor was simply clarifying that the exam results
6   were consistent with a claim of recent penetration.  Although defense counsel
    was free to infer that the evidence did not definitively prove recent
7   penetration, the prosecutor was likewise free to infer that the evidence was
    consistent with such a claim.  The prosecutor was not improperly referring to
8   evidence outside the record but instead was simply drawing a reasonable
    inference from evidence presented to the jury.  Under the circumstances, we
9   conclude the prosecutor did not commit misconduct.

10  Ex. E at 35.

11      A review of the doctor's testimony indicates that the prosecutor did not misstate the

12  facts, and petitioner has not shown that the denial of this claim was unreasonable.  Jane

13  Doe No. 1 reported that she had been inappropriately touched several times and the most

14  recent occasion was one month prior.  RT at 527, 532.  After performing the examination

15  the doctor concluded that she had physical findings suggestive of trauma that confirmed

16  the history she reported.  RT at 545, 550-51.  While the doctor did not specifically state that

17  the evidence reflected penetration in the prior month, his statements that Jane Doe No. 1

18  had been abused and that the evidence supported her reported history could reasonably

19  reflect that there had been abuse in the prior month as she had reported.  The prosecutor's

20  statement was not misconduct, and even if it was, petitioner has not shown that this minor

21  error so infected the trial with unfairness as to make the resulting conviction a denial of due

22  process.  Petitioner has failed to demonstrate that any of the alleged misstatements by the

23  prosecutor were contrary to Supreme Court authority; therefore, the claim is denied.

24  **V.     Appealability**

25      The federal rules governing habeas cases brought by state prisoners require a

26  district court that denies a habeas petition to grant or deny a certificate of appealability

27  ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll.   §

28  2254 (effective December 1, 2009).

25

1   To obtain a COA, petitioner must make "a substantial showing of the denial of a

2   constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the

3   constitutional claims on the merits, the showing required to satisfy § 2253(c) is

4   straightforward:  The petitioner must demonstrate that reasonable jurists would find the

5   district court's assessment of the constitutional claims debatable or wrong."  *See Slack v.*

6   *McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA

7   to indicate which issues satisfy the COA standard.  Here, the court finds that petitioner's

8   third and fourth claims regarding the trial court's exclusion of certain impeachment

9   evidence and the allegations of prosecutorial misconduct meet the above standard and

10  accordingly GRANTS the COA solely for those claims.  *See generally Miller-El*, 537 U.S. at

11  327.

12  Accordingly, the clerk shall forward the file, including a copy of this order, to the

13  Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270

14  (9th Cir. 1997).  Petitioner is cautioned that the court's ruling on the certificate of

15  appealability does not relieve him of the obligation to file a timely notice of appeal if he

16  wishes to appeal.

17                                                **CONCLUSION**

18  For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

19  A certificate of appealability is **GRANTED**.  *See* Rule 11(a) of the Rules Governing

20  Section 2254 Cases.

21  The clerk shall close the file.

22  **IT IS SO ORDERED.**

23  Dated: November 18, 2014.        _____

24                                                PHYLLIS J. HAMILTON
                                                  United States District Judge

25

26  G:\PRO-SE\PJH\HC.13\Hale2151.hc.wpd

27

28

                                                26